Damoorgian, J.
This is an appeal from a- final summary judgment entered in favor of Bob Jackson, Inc. in Appellant’s lawsuit against Bob Jackson; Inc. and one of its real estate agents. For the reasons set forth below, we affirm in part and reverse in part.
Appellant, a 93-year-old woman, filed a multi-count[1] lawsuit against Charles Wilson, a real estate sales associate, and Bob Jackson, Inc. the brokerage firm with whom Wilson was associated (the “Brokerage Firm”). The suit was largely based on claims that Wilson exploited and abused Appellant by using Appellant’s money to pay his personal expenses, entering Appellant into real estate transactions for his own dealing and benefit, and purchasing a condominium for himsélf with Appellant’s money. Appellant also sued the Brokerage Firm for one count of “Vicarious Liability” and one count of “Direct Liability,” alleging that the Brokerage Firm was vicariously responsible for Wilson’s actions because it facilitated and earned commissions from Wilson’s unlawful real estate transactions and was “directly” liable to Appellant because it did not properly manage certain escrow funds. Specifically, Appellant alleged that: ,
• She met Wilson through an introduction facilitated by another agent of the Brokerage Firm whom she had used to find a rental property.
• Wilson agreed to help her renovate and sell a dilapidated condominium unit she owned (Unit 704) in ex *71 change for a share of the proceeds and an exclusive listing agreement with the Brokerage Firm. The renovation agreement was between Appellant arid Wilson individually.
• Appellant granted Wilson status as her power of attorney for purposes of renovating Unit 704.
• Wilson failed to consider Appellant’s cost basis when calculating his share of the proceeds from the sale, of Unit 704 and Wilson and the Brokerage Firm Received a commission on the sale.
• Wilson convinced Appellant to purchase another condominium unit for her personal residence, Unit 304, for which Wilson and the Brokerage Firm received a commission.
• Wilson convinced Appellant to purchase yet another unit, PHt-2, for renovation and resale. Wilson and the Brokerage Firm received a commission on both Appellant’s purchase and subsequent sale of PH-2. The transaction resulted in a financial loss to Appellant.
• Wilson used ¡Appellant’s money to purchase a condominium unit for himself which was deeded in the name of a trust Wilson created. . The Brokerage Firm’s principal, Bob Jackson, acted-as the sales-agent for this transaction and both Jackson and the Brokerage Firm received a commission.
The Brokerage Firm moved for summary judgment, arguing that the “uncon-troverted facts” established that it always acted fairly with respect to Appellant and any wrong acts committed by Wilson were “outside the scope of his work on behalf- of [the Brokerage Firm]” and were done to accomplish Wilson’s “own purpose and not to serve the interests of [the Brokerage Firm].” In. support of its motion, the Brokerage Firm submitted excerpts from the depositions of Appellant, Wilson, and Jackson. That evidence corroborated each of the afore-outlined allegations and also established that:
• Jackson was aware that 'Wilson' was Appellant’s attorney-in-fact at the time Unit. 704 sold..
• While the contract for Appellant’s purchase of Unit 304 was pending, Wilson wired $300,000 from Appellant’s bank account into the Brokerage Firm’s escrow. Jackson testified that Wilson told him that the money was for the purchase of ádditional unspecified properties. Jackson informed Wilson that he would not hold any money in escrow without a corresponding contract and refunded it via cashier’s check to Appellant the next day.
• Wilson created the trust used to purchase his condo unit at the advice of Jackson because of the “litigiousness in Florida.”
• Jackson admitted that he was acting as the broker/sales agent for Wilson’s purchase of his condo unit and was aware that Wilson paid with cash although the closing was previously extended twice because Wilson could not come up with financing.
• Jackson acknowledged that Wilson stated that he was borrowing-money from Appellant at one point in time. However, Jackson did not think that any financial arrangement reached between Wilson and Appellant was any of his business.
Additionally, the Brokerage Firm submitted an affidavit executed by Jackson in which he swore that he “performed an analysis of all checks made payable from [Appellant] to [the Brokerage Firm’s] es.crow account between 2012 and 2014. The *72 checks received from [Appellant] totaled $38,050 on three separate transactions and were properly and ethically handled by [the Brokerage Firm].” The affidavit went on to outline where every dollar of the money paid by Appellant into the Brokerage Firm’s escrow account went.
Without explanation, the court granted the Brokerage Firm’s motion for summary judgment and entered judgment in its favor. This appeal follows.
Vicarious Liability Count
General principles of vicarious liability establish that a principal is responsible for the wrongful acts of its agent if the agent was either acting “(1) within the scope of [its authority], or (2) during the course of [the agency] and to further a purpose or interest of the [principal].” Valeo v. E. Coast Furniture Co., 95 So.3d 921, 925 (Fla. 4th DCA 2012). Additionally, a principal may be still be liable for the acts of its agent which were outside the scope of the agent’s authority if the principal subsequently ratifies the actions. See McDonald v. Hamilton Elec., Inc. of Fla., 666 F.2d 509, 514 (11th Cir. 1982). A principal may ratify an agent’s actions which would have otherwise been outside the scope of its authority by accepting the benefit of the agent’s actions. See Mercury Ins. Co. of Fla. v. Sherwin, 982 So.2d 1266, 1270 (Fla. 4th DCA 2008) (“A principal may not accept the benefits of a transaction negotiated by the agent and disavow the obligations of that same transaction.”). In other words:
‘[w]hen an agent acts for his principal, and the principal accepts the fruits of the agent’s efforts, the principal must be deemed to have adopted the methods employed, and he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the means by which they were acquired.’
Fredrick v. Squillante, 144 So.2d 848, 849 (Fla. 2d DCA 1962) (quoting Chase v. Sullivan, 99 Fla. 202, 126 So. 359, 360 (1930)).
This doctrine was applied to the detriment of a real estate broken in Fraioli v. Bobby Byrd Real Estate, Inc., 630 So.2d 1131, 1132 (Fla. 2d DCA 1993). There, one of the broker’s sales agents and the plaintiff partnered to open and run a restaurant. Id. The property which the men chose to lease for the location of their restaurant was listed by the broker, so the sales agent acted as both the leasee and sales agent for the transaction—earning the broker a sizeable commission in the process. Id. Shortly after the restaurant opened, the state seized the property due to delinquent taxes owed by the previous owner. Id. The plaintiff sued his partner— the sales agent—and the broker for fraudulent inducement and fraudulent misrepresentation, alleging that the sales agent exaggerated the fair market value of the property and misrepresented the results of a title search. Id.
The broker moved for summary judgment, arguing that the “false assurances alleged in the complaint stemmed from and were confined to the private business venture undertaken by and between” plaintiff and the sales agent and that the sales agent had no authority in his capacity as an agent for the broker to induce the real estate transaction by false means. Id. The trial court agreed with the broker and entered summary judgment in its favor. Id. On appeal, however, the appellate court reversed, holding that “the question of [the sales agent’s] actual or apparent authority to act in the manner alleged by [the plaintiff] is not controlling.” Id. Rather, based on the doctrine excerpted above, the court held that the fact the broker received a commission as a result of the sales agent’s actions exposed it to liability in the event *73 the sales agent did indeed act fraudulently. Id.
Here, the Brokerage Firm argues that summary judgment in its favor was proper because any wrongful action on the part of Wilson stemmed from a private business venture between Appellant and Wilson, and was committed to accomplish his own purpose. This argument is nearly identical to the argument raised by the broker and rejected by the court in Fraio-li, and fails to address the undisputed material fact that the Brokerage Firm received a commission from each of the real estate transactions which were effectuated by Wilson’s alleged wrongful conduct.
In addition to the receipt of commissions, additional facts raise questions about the Brokerage Firm’s ratification of Appellant’s potentially wrongful conduct. Specifically, there were factual disputes over whether the Brokerage Firm’s principal accepted a commission for Wilson’s purchase of his condo unit knowing that: 1) Wilson was Appellant’s attorney-in-fact at the time he purchased the unit; 2) Wilson was having problems obtaining financing for the purchase of the unit before he became Appellant’s attorney-in-fact; 3) Wilson had previously wired funds from Appellant’s account to the Brokerage Firm’s escrow for the eventual purchase of real estate, and subsequently paid cash for his unit; and 4) the Brokerage Firm’s principal’s suggestion that a trust be formed to hold title to Wilson’s unit in order to avoid liability.
In sum, the Brokerage Firm’s receipt of commissions on the alleged wrongful real estate deals, as well as its possible knowledge that Wilson was wrongfully using Appellant’s funds to purchase real estate, raised issues of fact precluding summary judgment on Appellant’s vicarious liability claim against the Brokerage Firm. See also Goodman v. Rose Realty W., Inc., 193 So.3d 86, 87-88 (Fla. 4th DCA 2016) (reversing summary judgment entered in favor of real estate broker based on vicarious liability for sales agent’s fraudulent conduct in selling the agent’s own home because broker received a commission on the transaction).
Direct Liability Count
Appellant also argues that the Brokerage Firm is contractually liable to her because it refunded her the $300,000 wired from her account into the Brokerage Firm’s escrow account while the Unit 304 sales contract was pending. Appellant maintains that by refunding the $300,000, the Brokerage Firm breached its duties as the Escrow Agent under the terms of the Unit 304 contract and facilitated Wilson’s later fraudulent use of the funds. The Brokerage Firm counters that it had no contractual duty to hold the $300,000 in its escrow account.
The record established that Appellant entered into a contract for the purchase of Unit 304. The Brokerage Firm was designated as Appellant’s “Escrow Agent” for the transaction. Pursuant to the contract, Appellant deposited $15,000 with the Escrow Agent. There is no dispute that the Brokerage Firm acting as Appellant’s Escrow Agent properly handled that $15,000 deposit. While the sale was pending, $300,000 was wired from Appellant’s account to the Brokerage Firm’s escrow account. The Brokerage Firm immediately refunded. Appellant the $300,000.
Appellant maintains that the Brokerage Firm was required to hold the $300,000 until the sale of Unit 304 was finalized. However, the Escrow Agent was only required to hold and disburse funds pursuant to the terms of the contract. The only escrowed funds alluded to in the contract was Appellant’s $15,000 deposit. Accordingly, we reject Appellant’s claim that *74 the Brokerage Firm had a contractual duty to ensure that Appellant was not financially abused in other transactions. Accordingly, we affirm the summary judgment on the Direct Liability Count.

Affirmed in parti reversed in part.

Gerber and Forst, JJ., concur.

. Appellant alleged causes of action against Wilson for breach of fiduciary duty, breach of contract, unjust enrichment, conversion, civil •theft> and exploitation of the elderly.